UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE JAMES JONES,

        Plaintiff,

v.

SHERRY BURT, *et al.*,

        Defendants.

                        /

Case No. 1:21-cv-41

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

Plaintiff Willie James Jones ("Jones") is a prisoner in the custody of the Michigan Department of Corrections ("MDOC"). Jones filed this prisoner civil rights lawsuit pursuant to 42 U.S.C. § 1983. The alleged incidents occurred at Muskegon Correctional Facility ("MCF"). Jones sued MDOC Director Heidi Washington, MCF Warden Sherry Burt, MCF Deputy Warden D. Steward (named as "Stewart") and MCF Captains B. Hall and S. King. The Court dismissed Director Washington. This matter is now before the Court on a motion for summary judgment filed by defendants Burt, Steward, Hall and King (ECF No. 39).

    **I.**    **Jones' claims**

Jones alleged that defendants' response to COVID-19 from July 23, 2020 through July 28, 2020 violated his Eighth Amendment rights. The Court summarized the gist of his complaint as follows:

> Specifically at his facility, Plaintiff alleges that MCF Defendants failed to follow MDOC protocols established to reduce the risk of COVID-19 transmission within prisons. Plaintiff alleges that on July 23, 2020, another prison became ill and went to MCF's health services. MCF health services apparently suspected the prisoner may have been COVID-19 positive because they collected a sample for a

1

> polymerase chain reaction (PCR) test. MCF personnel allegedly returned the ill prisoner to his unit pending the results of his PCR test. Until the PCR test results were reported the following day, MCF personnel permitted the ill prisoner to come into close contact with multiple other prisoners including Plaintiff. On July 24, 2020, the ill prisoner's PCR test returned positive for COVID-19. At that point, MCF staff isolated Plaintiff and tested him for COVID-19. Plaintiff's results returned positive for COVID-19 on July 28, 2020, as did results for others in Plaintiff's unit at MCF.

Opinion (ECF No. 6, PageID.68). Jones seeks compensatory damages, punitive damages, and injunctive relief. Compl. (ECF No. 1, PageID.18).

The only remaining claim is what Jones referred to as "Issue I" directed against defendants Warden Burt, Deputy Warden Steward, Captain Hall, and Captain King. In this claim, Jones alleged that Burt and Steward did not follow Director Washington's safety protocols by failing to quarantine housing unit 2 inmates to their individual cells to isolate and protect the inmates and to slow the spread of COVID-19 after confirmation that a positive case was active among the inmates in that unit. Specifically, Jones alleged that on July 23, 2020, another unit 2 inmate (Shannon) was tested for Covid-19 but not isolated until the test results were completed. During this time, Shannon was allowed to return to unit 2 where he "interacted with multiple inmates at close contact and used shared appliances such as telephones." Shannon tested positive for COVID-19 on July 24, 2020. However, Jones was not isolated for being in close contact with Shannon until July 28, 2020, and tested positive on that date. Compl. (ECF No. 1, PageID.4-6).[1]

In a later order, the Court noted that Jones' complaint included allegations that Warden Burt and Deputy Warden Steward failed to use isolation areas for prisoners who tested positive "as well as those under investigation for the virus and those who have had close contact with known positive covid-19 individuals;" and, that after the MDOC learned that inmate Shannon tested positive, Warden Burt and Deputy Warden Steward ordered Captains Hall and King to

---

[1] The Court notes that Jones did not test positive until July 29, 2020. *See* discussion, *infra*.

lockdown housing units in a manner that was insufficient for the situation. Order (ECF No. 31, PageID.211).

At his deposition, Jones testified regarding the events which occurred during the time frame of July 23, 2020 through July 28, 2020, and clarified his claims against defendants. *See* Jones Dep. (ECF No. 40-2, PageID.424-427). Jones testified that inmate Shannon was feeling sick, was tested for COVID-19, and returned to the unit that night. *Id*. at PageID.424-425. "[T]he very next morning healthcare officials rushed over to housing Unit 2 and secured him [Shannon] and said that he had COVID-19" and then "[t]ook him out of the unit." *Id*. at PageID.425.

Jones did not testify as to the date that these incidents occurred. *Id*. at PageID.424-425. However, Jones alleged in his complaint that Shannon became ill on July 23, 2020. Using this date, Jones testified that Shannon tested positive the next morning, which would have been July 24, 2020. It is unclear how Jones knew that inmate Shannon tested positive on that date. In his declaration, MCF's Health Unit Manager Michael Wilkinson stated that MCF had its first confirmed positive COVID-19 prisoner on July 25, 2020, and that this prisoner had been housed in unit 2 prior to his positive COVID-19 test. Wilkinson Decl. (ECF No. 43-1, PageID.572). *See also* Lab Report (redacted) (ECF No. 43-1, PageID.573). Whether this prisoner was Shannon or someone else, Wilkinson's declaration established that MCF did not face its first confirmed COVID-19 case until July 25, 2020.

Jones testified that after removing Shannon from the unit, "everything went on as normal," *e.g.*, "We was playing cards, we was eating, we was moving around the unit, we was going on our assigned details and all of these type of things." Jones Dep. at PageID.425. Jones stated that he took a COVID-19 test on July 27, 2020, because he had a follow-up appointment with an off-site dentist. *Id*. at PageID.427. On July 28, 2020, unidentified individuals (referred to

as "they") told Jones that he was a close contact with inmate Shannon and placed him in segregation. *Id*. "The next morning, the doctor came into Segregation, called me to the door and said, 'You're positive for COVID-19.'" *Id*. *See* Lab Report (ECF No. 1-1, PageID.24) (confirming that Jones tested positive for COVID-19 on July 29, 2020).

Jones testified that he was very ill at this time. He felt lightheaded, had back pains, had difficulty breathing, lost his sense of taste and smell, was vomiting a lot, and under the impression that he was going to die. Jones Dep. at PageID.428. Jones testified that the MDOC transferred him to its medical facility at Duane Waters Hospital on or about July 29th. *Id*. at PageID.428-429.[2] Jones stayed at the hospital for about two or three weeks. *Id*.

Defendants' counsel asked Jones to clarify his specific claims against defendants. Counsel asked Jones "between this July 23rd, until you were transferred out on either the 28th or the 29th, did you speak directly with [defendants] Warden Burt, Deputy Warden Steward, Officer King or Officer Hall?" *Id*. at PageID.430. Jones responded:

> I spoke to Deputy Warden Steward while I was in Segregation. You know, the windows in Seg -- they have windows in Segregation, and he was walking on the back path of – you know, this was on the 28th, when everything was exploding and everybody started reporting sicknesses. He walked – he was walking up the back of Segregation and we started talking to him and asking him, like, "What's going on, man?" I said, "I've been brought over here to Segregation. I'm feeling sick." You know what I'm saying? "They took my vitals and just threw me in the hole. What's going on?"
>
> He said Warden -- he said Warden Burt told him to tell Shift Commanders -- the Shift Commanders to lockdown, quarantine all of the units. And I said, "Well, what about me being up in here sick?" He said, "I don't know." He said, "I'm going to try to get you some medical attention," and all of that. He said, "But everything is being done by the Warden." This is what -- this is what Steward told me, personally, while I was in Seg."

---

[2] Jones testified that he was transferred to Duane Waters on July 28th or July 29th. Jones Dep. at PageID.428-429. Based on his previous testimony and the COVID-19 test result, he could not have been transferred to Duane Waters on July 28th, because he was still in segregation at MCF waiting for the test results.

4

*Id*. at PageID.430-431. When counsel asked, "Did you speak to [Warden] Burt or [Captain] King or [Captain] Hall at all?", Jones replied, "Not when I was in Seg, no. No, I did not." *Id*. at PageID.431.

When asked to identify his claims against Captains Hall and King, Jones testified:

They carried out the orders of Burt and Steward. That's what my complaint says about them. Because they knew what -- they knew -- they knew, from what their Interrogatory questions, that they knew the dangers of COVID-19. They knew everything from 30R3, memorandum 30R3. They understood everything that was going on, and they knew that no close contacts had been picked up in Unit 2, period. You feel where I'm coming from?

And so they never told us to go to our cells and lockdown until we can do close contact tracing anything. And this is at a time before there were any vaccines available or anything, and people were dying on a regular basis. You feel where I'm coming from? There's people dying everyday from this deadly disease, and you can – it can be transferred through touch. We using the JPay, we sharing the JPays. We sharing microwaves. We doing all of these -- they letting us do everything as normal, and this guy was positive for COVID-19.

*Id*. at PageID.433-434.

Finally, counsel asked Jones to identify the injuries that he suffered "as a result of each of the defendants' conduct?" *Id*. at PageID.437. Jones responded:

I told you; I told you. I caught COVID-19. COVID-19 was my injury, meaning I suffered from dizziness, back aches. I suffered -- I had conditions that I had never experienced. Before COVID-19, I didn't have a problem with breathing. I could run for two or three miles. Once I caught COVID-19, I couldn't run a half a mile. You know what I'm saying? Shortness -- I had shortness of breath, dizziness, all types of stuff, back pains. I was going through things. And I put in a mad medical -- excuse me. I put in a lot of medical requests for my long COVID symptoms, and every time I went over to healthcare all they told me is, "There's nothing we can do; there's nothing we can do. We don't know." Or their famous line, "That's happened to me, too, but I'm just living with it." You know what I'm saying? So, yeah, I was going through some things with it, but there was nothing they could do. All they did was give us vitamins and check our blood pressure. Give you vitamins, check your blood pressure, that's it.

*Id*. at PageID.437-438.

## II. Defendants' motion for summary judgment

### A. Legal standard

Defendants have moved for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Discussion

Defendants seek summary judgment for three reasons. First, Jones' § 1983 claim fails because he presented no evidence that they were personally involved in the alleged

unconstitutional conduct. Second, defendants are entitled to qualified immunity. Third, Jones cannot prove that defendants' conduct caused his alleged harm.

1. **Jones' Eighth Amendment claim**

Jones seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

On initial screening, the Court set forth the legal standard applicable to Jones' Eighth Amendment claim:

> Plaintiff alleges that the Defendants were deliberately indifferent to his health and safety. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.
>
> In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical

claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

In a case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in Wilson had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing — which places inmates within feet of each other — and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id*. at 840.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id*. at 42-43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

> Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id*. at 840-41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id*. at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448-49 (6th Cir. 2014); Harrison v. Ash, 539 F.3d 510, 519-20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] [ ] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id*. at 1088-90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id*. at 1085-86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id*. at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam)] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport."

> *Id*. at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id*. at 802-03. In *Marlowe*, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2-3.

*Wilson*, 961 F.3d at 841-42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment.

*Id*. at 843-44.

Opinion at PageID.70-74.

### 2. Personal involvement

Defendants contend that Jones did not present facts to establish that they were personally responsible for violating his Eighth Amendment rights. "Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed. Appx. 972, 974 (6th Cir. 2011). "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). A defendant cannot be held liable under § 1983 absent a showing that they personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the

11

allegedly unconstitutional conduct. *See*, *e.g.*, *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982).

Defendants presented the declaration of Warden Burt which set out the responsibilities of MCF staff members when the first inmate tested positive for COVID-19 on July 25, 2020. Warden Burt stated that custodial and supervisory employees such as herself, Deputy Warden Steward, and Captains Hall and King were not responsible for identifying prisoners who tested positive for COVID-19 and tracing the close contacts of those prisoners for quarantine. Rather, this responsibility fell to the medical staff at MCF healthcare:

> I became aware that there was a prisoner that tested positive for COVID-19 at MCF on July 25, 2020. This was MCF's first known positive case of COVID-19. Close contract tracing was conducted and prisoners under investigation (PUI's) for potentially having COVID-19 were identified and quarantined within 24 hours.

Burt Decl. (ECF No. 40-3, PageID.442). In this regard, Warden Burt explained that, "Healthcare was responsible for identifying prisoners that tested positive for COVID-19 and providing this information to appropriate staff for proper quarantine placement" and "[c]lose contact tracing was conducted by various staff designated by the Warden." Burt Decl. (ECF No. 40-3, PageID.442). Defendants Deputy Warden Steward, Captain King, and Captain Hall "were part of administrative and supervisory custodial staff and not responsible for identifying prisoners that tested positive for COVID-19" and that these individuals "were not involved in close contact tracing." *Id*. Warden Burt also stated that, "Captain King and Captain Hall were involved with directing custodial staff in the quarantining of positive COVID-19 prisoners upon receiving a list of positive prisoners from healthcare." *Id*.

There is no evidence to support Jones' claim that defendants Burt, Steward, Hall and King had personal involvement in identifying positive COVID-19 prisoners, tracing the close contacts of those prisoners, and determining which prisoners to quarantine. As discussed, MCF

healthcare personnel were responsible for these medical decisions. To the extent Jones asserts that defendants were personally involved in the alleged constitutional violation because they managed the day-to-day operations of the facility (*e.g.*, Deputy Warden Steward's statement that "everything is being done by the Warden"), his claim fails because Jones may not maintain a § 1983 claim based on a respondeat superior theory. "Section 1983 liability must be premised on more than mere respondeat superior, the right to control one's employees." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).

There is no evidence that Jones had any personal contact with Captain Hall or Captain King during the relevant time period.

Finally, Jones testified that he spoke to Deputy Warden Steward while in segregation awaiting his COVID-19 test results. Assuming that Steward told Jones that "everything is being done by the Warden" and "I'm going to try to get you some medical attention," such statements are not evidence that Steward was involved in identifying prisoners that tested positive for COVID-19, close contact tracing of prisoners, or quarantining prisoners. Accordingly, defendants should be granted summary judgment on this basis.

### 3. Qualified immunity

In the alternative, defendants are entitled to qualified immunity. Under the affirmative defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . Put simply, qualified immunity protects all but the plainly incompetent or

13

those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). Thus, the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

"When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). The Sixth Circuit applies a two-tiered inquiry in reviewing the dismissal of a claim on qualified immunity. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

> The first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was clearly established when the event occurred such that a reasonable officer would have known that his conduct violated it.

*Id*. (internal quotation marks omitted).

Jones contends that there are seven genuine issues in dispute which preclude granting defendants' motion for summary judgment:

> A. Did the Defendants comply with director's memorandum 30R3 and isolate close contacts to a positive inmate for the Coronavirus?
>
> B. Were the inmates properly informed that they had been exposed to a positive inmate for the Coronavirus?
>
> C. Were the inmates locked down/quarantined in a manner that was contrary to the memorandum and enhanced the probability of infection?
>
> D. Did the Defendants [sic] authorization of Unit activities to continue as normal for six days before any close contacts were identified and isolated contribute to the wide spread infection within the housing unit?
>
> F. Did the Defendants wait six days before conducting close contact tracing?
>
> G. Did these factor's [sic] combined more than likely lead to the Plaintiff contracting the Coronavirus?

14

Jones' Brief (ECF No. 42, PageID.455-456).

As an initial matter, there is no evidence to support Jones' claim that defendants waited six days before conducting close contact tracing and isolation. As discussed, MCF healthcare personnel identified prisoners that tested positive for COVID-19 and provided this information to appropriate staff for proper quarantine placement. None of the defendants conducted close contact tracing, and defendants Hall and King directed custodial staff in quarantining positive COVID-19 prisoners upon receiving a list of positive prisoners from healthcare. Furthermore, there is no evidence of a six-day delay in identifying close contacts and isolating prisoners. MCF personnel commenced contact tracing after identifying the first COVID-19 positive prisoner on July 25, 2020. Jones himself was identified as a close contact within three days and placed in segregation on July 28, 2020.

Next, assuming that all of the other "disputed facts" are found in Jones' favor, the Court concludes that defendants are entitled to qualified immunity. This Court previously addressed Warden Burt and Deputy Warden Stewards' response to the COVID-19 pandemic in *Gordon v. Burt*, No. 1:21-cv-415, 2023 WL 4409200 (May 3, 2023), *R&R adopted*, 2023 WL 3914934 (W.D. Mich. June 9, 2023). *Gordon* involved a prisoner's Eighth Amendment claim against Burt and Steward for failing to properly implement COVID-19 protocols in July 2020:

> Regarding his Eighth Amendment claim, Plaintiff alleged that after Defendant Burt notified the MCF general population of the first positive COVID-19 case at the facility on July 27, 2020, Defendants Burt and Steward instructed Housing Unit 2 officers to arrange for the close-contact Unit 2 prisoners to be transferred to Unit 1, where Plaintiff was housed. (ECF No. 1 at PageID.3.) Plaintiff alleged that Defendants Burt and Steward failed to isolate the close-contact prisoners from the non-close-contact prisoners who already resided in Unit 1, and that the close-contact prisoners were allowed to access the restrooms, showers, TV-room, and day-room along with the other prisoners. Plaintiff also alleged that he was a Unit-1 porter, and neither he nor any of the other porters in Unit 1 were instructed to sanitize the areas occupied by the close-contact prisoners. (*Id.*)

15

*Gordon*, 2023 WL 4409200 at *1.

The Court determined that while the plaintiff met the first prong of the qualified immunity inquiry (*i.e.*, his complaint stated an Eighth Amendment claim), the second prong remained open (*i.e.*, whether defendants' acts that allegedly violated the plaintiff's constitutional rights also violated clearly established clearly established law). *Id*. at *3. The Court found that defendants Burt and Steward were entitled to qualified immunity because the prisoner could not meet the "clearly established" prong of the qualified immunity claim. *Id.* at *3-6. In reaching this determination, the Court explained that a reasonable prison official could not have known whether their response to the COVID-19 epidemic in July 2020 would have violated a prisoner's Eighth Amendment rights:

> The clearly established prong focuses on the state of the law at the time the alleged violation occurred. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015)). It is not enough to show that the right is established at " 'a high level of generality.' " *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting Ashcroft, 563 U.S. at 742, 131 S.Ct. 2074). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id*. at 993 (quoting *White*, 137 S. Ct. at 552). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019). "An official's conduct flunks this 'clearly established' test only if the conduct's unconstitutionality was 'beyond debate' when the official acted, such that any reasonable person would have known that it exceeded constitutional bounds." *DeCrane v. Eckart*, 12 F.4th 586, 599 (6th Cir. 2021). To determine whether a right is clearly established, a district court within the Sixth Circuit may consider binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3 565, 569 (6th Cir. 2002)).
>
> I conclude that in light of the circumstances surrounding COVID-19, a novel coronavirus, and the unique and unprecedented challenges prison officials

16

faced in implementing COVID-19 precautionary measures, particularly in the early months of the pandemic (*see* ECF No. 39-5 at PageID.218 at PageID.218, Centers for Disease Control and Prevention Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (recognizing that constraints such as physical space, staffing, population, operations, and other resources and conditions may require adaptation of preventative measures)), this is an appropriate case to consider the clearly established prong at the motion to dismiss stage. *See Jones v. Burt*, No. 1:21-cv-41, 2022 WL 4244298, at *5-7 (W.D. Mich. July 15, 2022), *report and recommendation adopted in part and rejected in part*, 2022 WL 3210073 (W.D. Mich. Aug. 9, 2022) (granting motion to dismiss raising qualified immunity on claim that prison officials failed to allow social distancing in the dining hall because the plaintiff failed to show that "it was clearly established law and beyond debate that a prison employee violated the Eighth Amendment by seating two inmates at a four-person dining hall table, which resulted in less than six feet of social distancing between the two inmates"); *Brewer v. Dauphin Cnty. Prison*, No. 1:21-CV-1291, 2022 WL 16858014, at *9-10 (M.D. Pa. June 29, 2022), *report and recommendation adopted*, 2022 WL 16855566 (M.D. Pa. Nov. 10, 2022) (concluding in the alternative that the plaintiff failed to demonstrate a violation of a clearly established right because courts have declined to find a clearly established right in the context of COVID-19 in a prison setting "where prison administrators were, and still are, faced with a novel virus, and those administrators took steps to mitigate the exposure to and spread of the virus"); *Ross v. Russell*, No. 7:20-cv-774, 2022 WL 767093, at *14 (W.D. Va. Mar. 14, 2022) (granting motion to dismiss based on qualified immunity on prisoner's claim that jail policies were inadequate to prevent the spread of COVID-19 because "it would not have been apparent to any of the defendants that their alleged conduct would violate [the plaintiff's] clearly established constitutional rights"); *Gasca v. Lucio*, No. 1:20-CV-160, 2021 WL 4198405, at *9 (S.D. Tex. May 24, 2021), *report and recommendation adopted*, 2021 WL 4192735 (S.D. Tex. Sep. 15, 2021) (concluding qualified immunity was appropriate on a motion to dismiss because the only pertinent authority "simply required officials to test and treat the inmates" and "[t]here was no caselaw requiring them to do more"); *Tate v. Arkansas Dep't of Corrs.*, No. 4:20-cv-558, 2020 WL 7378805, at *11 (E.D. Ark. Nov. 9, 2020), *report and recommendation adopted*, 2020 WL 7367864 (E.D. Ark. Dec. 15, 2020) (finding dismissal on qualified immunity grounds proper because "COVID-19 is, by definition, a 'novel' coronavirus" and reasonable officials would not have known that their COVID-19 response violated the plaintiff's clearly established constitutional rights"). . . .

As stated in *Ryan v. Nagy*, No. 2:20-cv-11528, 2021 WL 6750962 (E.D. Mich. Oct. 25, 2021), *report and recommendation adopted in part*, 2022 WL 260812 (E.D. Mich. Jan. 26, 2022):

> [A] reasonable official could not have known whether their COVID-19 response would have violated Plaintiff's Eighth Amendment

17

> rights. COVID-19 is unprecedented, and humanity's knowledge of the disease has evolved drastically over the course of the pandemic. *See Tate*, 2020 WL 7378805, at *11. Accordingly, official guidance on recommended safety measures is continuously changing. For example, masks, a now ubiquitous safety measure, were once believed to only be effective in certain medical settings. *See* Fact check: Outdated video of Fauci saying "there's no reason to be walking around with a mask", Reuters, October 8, 2020 [citation omitted]. The world's understanding of COVID-19 in [sic] constantly evolving, and there is no precedent that would have made it clear to a reasonable official that the measures Defendants took unreasonably responded to the COVID-19 pandemic.
>
> *Id*. at *9. In short, Plaintiff fails to cite any caselaw clearly establishing that Defendants' COVID-19 response violated his Eighth Amendment rights.

*Gordon*, 2023 WL 4409200 at *4-5. *Cf. Wilson*, 961 F.3d at 844 ("our precedents do not require that prison officials take every possible step to address a serious risk of harm.").

Like the plaintiff in *Gordon*, Jones claims that defendants' response to the COVID-19 pandemic at MCF in July 2020 violated his Eighth Amendment rights. For the same reasons as set forth in *Gordon*, defendants Burt, Steward, Hall and King are entitled to qualified immunity because there is no caselaw clearly establishing that the COVID-19 response at MCF in July 2020 violated the prisoners' Eighth Amendment rights. Accordingly, in the alternative to the ground set forth in § II.B.1., defendants' motion for summary judgment should be granted on the basis of qualified immunity.

### 4. Causation

Finally, defendants contend that Jones' § 1983 claim fails because he cannot prove by a preponderance of the evidence that defendants' deliberate indifference caused his alleged harm, *i.e.*, that Jones became infected with COVID-19 due to defendants' actions. After pointing out "that COVID-19 was a world-wide pandemic in July 2020," defendants ask the Court to speculate about how and when Jones became infected with COVID-19, and then ask the Court to

18

conclude that "Plaintiff cannot show by a preponderance of the evidence that but-for Defendants' alleged conduct, he would not have contracted COVID-19." *See* Defendants' Brief at PageID.413-415. Defendants' conclusory argument, which asks the Court to speculate and to weigh the evidence, is without merit and does not provide a basis for granting summary judgment.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (ECF No. 39) be **GRANTED** and that this action be **terminated**.

Dated: February 14, 2024

/s/ Ray Kent
Ray Kent
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).